*Electronically Filed*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| CARA NICHOLS and CYNTHIA MORRIS, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. _____ |
| FIREBORN ENERGY, LLC | § § § | |
| Defendant. | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Cara Nichols and Cynthia Morris (collectively the "Sisters") file this petition against Defendant Fireborn Energy, LLC ("Fireborn") and, on information and belief, allege the following:

### I.   NEED FOR ACTION

1. Based on promises by Fireborn, the Sisters entered into a Mineral Marketing Agreement ("MMA") with Fireborn, effective October 1, 2018. Under the MMA, Fireborn was to acquire prospective buyers of the Sisters' mineral interests (the "Mineral Interests") located in Howard County, Texas. The MMA had a 30-day "primary term" after the effective date. And, in the MMA, Fireborn undertook a fiduciary relationship in favor of the Sisters with respect to the sale of the Mineral Interests. In breach of its fiduciary duty to the Sisters, in order to obtain a commission, Fireborn arranged for the Sisters to sell to a materially-lower bidder who lacked the ability to close the transaction. Not being sophisticated and relying on Fireborn, the Sisters agreed to their detriment. When the time to close the Fireborn-arranged sale passed, along with the MMA's 30-day primary term, the Sisters terminated the MMA and the below-market transaction. The Sisters then sold the Mineral Interest, without Fireborn's assistance, at a better price. Fireborn has demanded a commission after its sale fell apart. The Sisters seek protection from this Court to declare the MMA properly terminated and, thereby, confirm that the Sisters have no further obligations to Fireborn under the MMA.

## II.     PARTIES

2. Cara Nichols is an individual residing in the State of Texas.

3. Cynthia Morris is an individual residing in the State of Texas.

4. Fireborn Energy, LLC is a Kentucky Limited Liability Company with its principal place of business at 102 East Columbia Street, Somerset, Kentucky 42502. Fireborn may be served through its agent for service of process, Thomas Wilbur Cate, at 102 East Columbia Street, Somerset, Kentucky 42501.

## III.     JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest. 28 U.S.C. § 1332(a). Both of the Sisters are individuals, residents of Texas, and, for jurisdictional purposes, citizen of Texas. On information and belief, Fireborn has two members, Thomas W. Cate, who is a resident and citizen of Kentucky, and Wesley P. Cate, who is a resident and citizen of Tennessee; further, on information and belief, none of the members or partners that make up Fireborn are citizens of Texas.

6. Venue is proper in the Eastern District of Kentucky under 28 U.S.C. § 1391(b)(1), because Fireborn, the only defendant, resides in the district.

7. This Court may exercise personal jurisdiction over Fireborn because it is a Kentucky Limited Liability Company with its principal place of business in Somerset, Kentucky and/or because some of Fireborn's conduct giving rise to the claims occurred in Kentucky.

## IV.     FACTS

8. The Sisters inherited the Mineral Interests upon the passing of their mother. Neither of the Sisters has experience with or a sophisticated understanding about minerals, the sale of minerals, or the market for the sale of minerals.

9.      By contrast, Fireborn professes and promised experience and expertise in minerals, the sale of minerals, or the market for the sale of minerals.

10.     Fireborn makes bold, but overstated, promises about its services:

   a.   "With an emphasis on expediency, communication and confidentiality, [Fireborn] provide[s] the best and most comprehensive geological and land management services available, all under one roof."

   b.   "With an experienced staff of registered and certified professional landmen, Fireborn Land & Energy has a wealth of knowledge in land management. No matter the type of project—oil and gas, wind, solar, forestry, or even public utility—Fireborn's capabilities allow us to offer our clients a unique perspective that adds value."

   c.   "Fireborn . . . has decades of collective experience in geological interpretation, engineering and professional land management."

   d.   "At Fireborn Energy, we believe in exceeding our clients' expectations."

   e.   "[O]ur capabilities allow us to offer you a unique perspective that adds value to every type of project. With an emphasis on expediency, communication and confidentiality, we provide the best and most comprehensive geological and land management services available."

   f.   "We utilize our past experience while pushing ourselves to explore new approaches and ideas that create streamlined efficiencies. Ultimately, we strive to provide a premium service that delivers premium results—going above and beyond to meet your needs."

11.     And, to the Sisters specifically with respect to the anticipated sale and MMA, Fireborn made several specific promises, which proved to be false, some examples of which are set out below:

   a.   Fireborn promised, "I can get you $25,000 per acre" for the Mineral Interests;

  b. Fireborn repeated, in reference to the promised $25,000-per-acre price, "I feel sure I can get you that much" for the Mineral Interests;

  c. Fireborn represented multiple times that it had "several qualified buyers" (and different variants of such a statement) for the Mineral Interests;

  d. Fireborn told the Sisters, "we have qualified buyers standing ready [for the Mineral Interests] if you all are in agreement;" and

  e. Fireborn told the Sisters that it would market the Mineral Interests to the "multiple," "qualified" buyers for the Sisters' benefit.

12. On or about September 25, 2018, and in reliance of such representations, Fireborn entered into the MMA with the Sisters. The MMA's effective date was October 1, 2018.

13. Under the MMA, Fireborn undertook to identify and present prospective buyers of the Sisters' Mineral Interests:

> [Fireborn] shall advise and make recommendations to [the Sisters] on those matters [the Sisters] may request with regard to oil, gas, and other mineral interests, which shall include but not be limited to the negotiations of the divestment of the [Mineral Interests], the analysis and/or review or other proposals for partial divestment, the values of [the Mineral Interests], the correctness of division orders prepared for execution by [the Sisters], and in all other matters relating to the interests as to which [Fireborn] possesses the necessary knowledge and expertise concerning the [Mineral Interests] and their marketing for divestment.

14. In the MMA, Fireborn undertook a fiduciary relationship in favor of the Sisters with respect to the sale of the Mineral Interests: "Manager agrees that it will act in a fiduciary manner when representing Owners."

15. Both before and after signing the MMA, Fireborn made promises and representations to the Sisters about getting the "highest price" for the Mineral Interests and having "multiple," "qualified" buyers for the Mineral Interests. And, before and after signing the MMA, Fireborn told the Sisters that it intended to undertake substantial marketing efforts on their behalf with respect to

the Mineral Interests. But, in reality (and as intended from the beginning), Fireborn conducted virtually no marketing efforts and, instead, arranged for the Sisters to sell the Mineral Interests almost immediately after entering into the MMA.

16.     The bidder that Fireborn arranged (the "Initial Buyer") offered the Sisters a price that was materially lower (when calculated on a per-net-mineral-acre basis) than another, then-existing offer that the Sisters had obtained without Fireborn. Indeed, the Initial Buyer's offer only appeared larger (to the unsophisticated Sisters) because the Initial Buyer misrepresented and overstated the acreage associated with the Mineral Interests to inflate the total purchase price and make the offer appear larger than other offers. But, on a per-net-mineral-acre basis (which is how mineral interests are valued in this type of transaction[1]), the Initial Buyer's offer was less than another, then-existing offer that had not been introduced by Fireborn.

17.     In order to secure a commission at the Sisters' expense, Fireborn pushed the Sisters to sign a Purchase and Sale Agreement (the "PSA") with the Initial Buyer despite the lower price and, overall, significantly-lower yield to the Sisters. Fireborn represented the Initial Buyer's offer as the "top offer," the "best offer," and/or the "highest offer" available for the Mineral Interests. Fireborn threatened to "withdraw" if the Sisters failed to sign the PSA promptly. Further, Fireborn pressured the Sisters to sign the PSA when the Initial Buyer placed short-fuse deadlines on the offer.

18.     Not being sophisticated in the business of buying and selling minerals, in reliance on Fireborn's false and inaccurate representations, and in reaction to Fireborn's pressure-laden tactics, the Sisters entered into the PSA with the Initial Buyer to their detriment. The PSA was dated October 2, 2018—one day after the effective date of the MMA.

---

[1] In a typical mineral transaction, the acreage is confirmed by running title and adjusting the total purchase price to conform to the established acreage multiplied by the per-net-mineral-acre price.

19. The PSA provided that, "[i]f the Closing does not occur within thirty (30) days, either [the Initial] Buyer or [the Sisters] may terminate [the PSA] upon written notice to the other."

20. The Initial Buyer lacked the ability to close the transaction contemplated in the PSA. As a result, the transaction contemplated in the PSA did not close within the 30-day window.

21. Because the closing contemplated under the PSA did not occur within the allotted 30 days, the Sisters notified the Initial Buyer, on November 2, 2018, that the Sisters intended to exercise their right to terminate the PSA:

> In the terms identified within the [PSA], signed on October 2, 2018, it is our desire to opt out of this agreement as outlined in Section 6 Closing. Specifically, the Closing did not occur within 30 days as outlined in the agreement nor has any request been asked or granted to an extension of the agreement.

22. Despite the Sisters' right to terminate the PSA, the Initial Buyer, first, demanded that the Sisters revoke the PSA termination and, next, threatened the Sisters with legal action:

> If no response [to the Initial Buyer's demand that the Sisters revoke their termination] by close of business tomorrow Nov-6th 5 pm CST whether or not they choose to move forward and close as agreed or breach contract, additionally no response will be regarded as rejection of our offer to close and will proceed the following day with the legal options available to us, which will include formal lawsuit filed in Tulsa County for Breach of contract, Specific Performance, Fraud and DTPA as well as lis pendens being filed on all tracts in question to halt any sale in Howard [County] and Martin [County]. I don't know about Texas but in Oklahoma the county usually frowns and removes employees involved in this type of lawsuit until the outcome has been determined.[2]

23. The MMA provided that "[a]ny prospective party introduced by [Fireborn] shall be deemed the Property of Manager and shall be subject to the commission for a period of one (1) year after the expiration of the primary term should Manager not be able to divest the Properties for [the Sisters]." Aside from the Initial Buyer, Fireborn did not introduce any other prospective parties as

---

[2] At the time of the threat, both of the Sisters worked for the government of Howard County, Texas. The Initial Buyer's reference to "the county" was a thinly-veiled threat against the Sisters' jobs.

potential buyers of thee Mineral Interests. And, after the 30-day "primary term," Fireborn had not notified the Sisters of any further negotiations with any prospective party.

24. On November 2, 2018, after the 30-day "primary term" had ended, the Sisters terminated the MMA in writing:

> Under the terms identified within the [MMA], deemed effective as of October 1, 2018[, and] signed by both parties noted above on September 25, 2018, under the terms outlined in Section 9, there are no outstanding negotiations since we have ended the [PSA] with [the Initial Buyer], nor has any request been asked for and granted to an extension to the said agreement.

25. In response, on November 4, 2018, Fireborn, while unhappy with the decision, recognized the propriety of the Sisters' termination and only asserted a right associated with unnamed prospective buyers that Fireborn purportedly had contacted before the Sisters' termination:

> As of Friday afternoon [i.e., November 2, 2018,] we received the final title and net offer for Howard County as well as a signed offer for Martin but <u>I will let [the Initial Buyer] know everything has been canceled</u>. I am somewhat perplexed as to your lack of respect to even call in regards to this matter. Fireborn has invested considerable time and capital in assisting you and your sister. The attorney we hired to help vest the document was over $400 per hour. I spent the majority of my vacation in Colorado helping negotiate this on your behalf. I fully understand your desire to divest this at the best price and that is our goal. However, I would have hoped for a more considerate approach given the amount of work we did on your behalf instead of just a cancellation email. <u>Please note that per our Agreement [i.e., the MMA], any corporation or entity that Fireborn showed this property to will be subject to th[e MMA]</u>.

26. On May 29, 2019, nearly six months later, an attorney for Fireborn sent the Sisters a demand letter asserting that "the controlling law in the Commonwealth of Kentucky" provides that "Fireborn did earn the commission [by virtue of the signing of the PSA] and the sisters owe it $110,565.00." The Fireborn lawyer then asserted that "[p]rompt payment is expected to avoid the filing of an action to collect this sum."

27. The Sisters do not owe Fireborn $110,565.00 or any other amount.

## V.   CONDITIONS PRECEDENT

28.   All conditions precedent to the Sisters' claims for relief have been fulfilled or have been performed.

## VI.   CLAIMS FOR RELIEF

**Count One: Declaratory Relief**

29.   The Sisters incorporate the foregoing paragraphs as though fully set forth herein.

30.   Fireborn has acted contrary to the MMA. A substantial controversy of sufficient immediacy and reality exists between the Sisters and Fireborn so as to warrant this Court's declaration on the matters presented. The Sisters and Fireborn hold adverse legal interests.

31.   The Sisters seek a declaration as to the following rights and legal relations:

   a.   That the Sisters were entitled to terminate the MMA;

   b.   That the Sisters properly terminated the MMA;

   c.   That the Sisters are not liable to Fireborn for any claim or cause of action associated with the MMA; and

   d.   That the Sisters are not liable to Fireborn for any other claim or cause of action.

**Count Two: Breach of Fiduciary Duty**

32.   The Sisters incorporate the foregoing paragraphs as though fully set forth herein.

33.   The relationship between Fireborn and the Sisters involved a special trust, confidence, and/or reliance on Fireborn to use its expertise and/or discretion when acting in the Sisters' interests.

34.   Fireborn knowingly accepted the Sisters' trust and/or confidence when agreeing to act on behalf of the Sisters.

35.   The Sisters were entitled to receive Fireborn's best efforts as a fiduciary to the Sisters. And the Sisters were entitled to rely on the belief that Fireborn was acting with skill, due care, and diligence on behalf of the Sisters.

36. Contrary to its fiduciary duties to the Sisters, in connection with the sale of the Mineral Interests, Fireborn gave inappropriate and/or unsound advice.

37. Contrary to its fiduciary duties to the Sisters, in connection with the sale of the Mineral Interests, Fireborn acted in a way that was adverse to and/or contrary to the Sisters interests.

38. Contrary to its fiduciary duties to the Sisters, in connection with the sale of the Mineral Interests, Fireborn acted for its own benefit and to the detriment of the Sisters.

39. Contrary to its fiduciary duties to the Sisters, in connection with the sale of the Mineral Interests, Fireborn put its interests ahead of those of the Sisters.

40. Contrary to its fiduciary duties to the Sisters, in connection with the sale of the Mineral Interests, Fireborn failed to provide a good faith and full disclosure of the circumstances of the relationship between Fireborn and the Initial Buyer.

41. Contrary to its fiduciary duties to the Sisters, in connection with the sale of the Mineral Interests, Fireborn misused the Sisters' confidential information.

42. The Sisters suffered harm as a direct and proximate result of these events and actions.

**Count Three: Fraud in the Inducement**

43. The Sisters incorporate the foregoing paragraphs as though fully set forth herein.

44. Fireborn made material representations, as set out above, to the Sisters in connection with Fireborn's ability to provide "many," "qualified" buyers and to obtain the "best price" for the Mineral Interests. Those representations were false. Fireborn knew the statements were false or made those statements recklessly. Fireborn made the statements as inducements to be acted upon by the Sisters. The Sisters acted in reliance on those statements when entering into the MMA.

45. Fireborn made representations as to its future intentions with regard to the plans and abilities to market the Mineral Interests. But Fireborn knew at the time it made the representations that it had no intention of carrying them out. Rather than market the Mineral Interests to "many,"

"qualified" buyers and obtain the "best price" available for the Mineral Interests, Fireborn intended to, and did, arrange for the sale of the Mineral Interests to the Initial Bidder.

46. The Sisters suffered harm as a direct and proximate result of these events and actions.

47. The Sisters are entitled to rescission of the MMA or, at their election, damages.

### VII. PUNITIVE DAMAGES

48. The Sisters seek exemplary and punitive damages on the basis that Fireborn acted toward the Sisters with fraud.

### VIII. JURY DEMAND

49. The Sisters demand a jury trial.

### IX. PRAYER FOR RELIEF

50. The Sisters respectfully pray:

   a. That Fireborn be cited to appear and answer herein;

   b. That the Court enter judgment against Fireborn and award the Sisters:

      i. Declaratory judgment as set out above;

      ii. Rescission of the MMA;

      iii. In the alternative (at the Sisters' election), actual damages;

      iv. Pre- and post-judgment interest at the maximum legal rate;

      v. An award of punitive damages;

      vi. Costs of court;

      vii. Attorney's fees; and

      viii. All such other relief, both general and special, at law or in equity, to which the Sisters may show themselves justly entitled.

Dated: June 25, 2019

Respectfully submitted,

/s/ W. Keith Ransdell
W. Keith Ransdell
David T. Royse
Ransdell Roach & Royse, PLLC
176 Pasadena Drive
Building One
Lexington, Kentucky 40503
Telephone: (859) 276-6262
Facsimile: (859) 276-4500
keith@rrrfirm.com
david@rrrfirm.com

and

Daniel H. Charest
(To be admitted *pro hac vice*.)
Texas Bar No. 24057803
Morgan Buller
(To be admitted *pro hac vice*.)
Texas Bar No. 24109670
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
mbuller@burnscharest.com

Counsel for Cara Nichols and Cynthia Morris